FILED
2020 Sep-18  AM 09:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHEN JUN, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:19-CV-01524-KOB** |
| | ) | |
| **REGIONS BANK,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

The facts underlying this case, unfortunately like too many others, involve an alleged fraud on investors. But unlike most fraud cases, the plaintiffs in this case have not joined the alleged fraudsters as defendants. Instead, the plaintiffs here seek to recover from the bank that held the account from which the fraudsters stole their funds. And as the court explains in the context of defendant Regions Bank's motion to dismiss (doc. 12) the plaintiffs' amended complaint (doc. 9), this case does not implicate complex securities law issues or murky elements of fraud. Rather, this case boils down to basic questions of state contract and tort law.

In this diversity case, the plaintiffs are thirteen foreign investors who unfortunately lost significant amounts of money in a fraudulent investment scheme. They sued Regions Bank, where the alleged fraudsters had an account that held the Investors' money. The Investors brought tort and contract-based claims against Regions, as well as other common-law claims. But the Investors have not pled the existence of any contract between themselves and Regions; nor have they established that anyone entered into a contract with Regions for their direct benefit.

Additionally, the Investors have not shown that Regions owed them any duty in tort or any fiduciary duty. Instead, they essentially seek to hold Regions strictly liable for their losses solely because of its status as the bank holding the account into which their EB-5 funds were deposited. As discussed below, this argument does not persuade the court. The Investors provide no factual support for their remaining claims.

As explained fully below, because the Investors have failed to state any claim against Regions upon which the court can grant relief, the court will **GRANT** Regions Bank's motion to dismiss (doc. 12) and will **DENY AS FUTILE** the Investors' request for leave to amend their complaint (doc. 16).

**Background**

The events underlying this case began when the Investors, all citizens of China, sought a path to permanent lawful residence in the United States. The Investors decided to take part in the EB-5 Visa program, which provides one such path. (Doc. 9 at 1). Under the EB-5 program, "immigrant investors" may qualify for lawful permanent residence in the United States after their investment in an approved "new commercial enterprise" creates at least ten full-time jobs in the United States. (*Id*. at 8). The Investors refer to dollars invested through the EB-5 program as "EB-5 funds." (*Id*. at 24).

Federal regulations govern both the source and use of EB-5 funds. *See* 8 C.F.R. § 204.6. These regulations require the investor applying for an EB-5 visa to submit a detailed report to the United States Citizenship and Immigration Services describing exactly how the immigrant investor "has invested or is actively in the process of investing lawfully obtained capital in a new commercial enterprise in the United States." 8 C.F.R. § 204.6(j). If the immigrant investor seeks an EB-5 visa by creating at least ten full-time jobs in the United States, the investor must invest

at least $500,000 in the "new commercial enterprise" and must provide detailed records to the USCIS showing that such investment did in fact create those jobs. 8 C.F.R. § 204.6(f)(2); (j)(4).[1] Such records may include, for example, the I-9 Forms of the employees hired by the "new commercial enterprise" after it received the immigrant investor's funds. 8 C.F.R. § 204.6(j)(4)(i)(A).

Attempting to take advantage of the EB-5 program, the Investors each invested between $540,000–$560,000 in the so-called "Palm House Enterprise," a project spearheaded by Robert Matthews. The Investors have not joined Matthews as a party in this case. (Doc. 9 at 9). The Palm House Enterprise apparently represented to the Investors that it qualified as a "new commercial enterprise" for the purposes of the EB-5 program. (*Id.* at 9–12). According to representations by the Enterprise, a new hotel it was constructing using the Investors' EB-5 funds would create enough jobs to satisfy the EB-5 requirements for each investor. (*Id.* at 19).

Matthews and the other players in the Palm House Enterprise, operating through several limited liability business entities, made multiple assurances to the Investors as to the Enterprise's use of their funds. First, the Palm House Enterprise assured the Investors that it would hold their EB-5 funds in escrow until the USCIS approved the Investors' residence petitions, in which case the Enterprise would use the Investors' EB-5 funds only to fund the construction of the hotel. (Doc. 9 at 9–12). If, on the other hand, the USCIS denied the Investors' residence petitions, the Palm House Enterprise agreed to return the Investors' money. (*Id.* at 9).

The alleged fraudsters ran the Enterprise partly through 160 Royal Palm, a limited liability company headed by its president Leslie Evans. (Doc. 9 at 24–26). The 160 Royal Palm

---

[1] At present, the EB-5 regulations require immigrant investors to advance at least $900,000 in capital to qualify for a job-creation EB-5 visa. When the Investors in this case sought to take advantage of the EB-5 program (between 2012 and 2013), the regulations only required a $500,000 investment. 8 C.F.R. § 204.6(f)(2) (amended 2019).

LLC opened a general business checking account at Regions into which the Palm House

Enterprise deposited the Investors' EB-5 funds. (*Id*. at 12, 24).

Unfortunately, the USCIS denied the Investors' permanent residence petitions, which

ultimately tipped the Investors off to the fraud. (Doc. 9 at 21–24). And, in the meantime, the

alleged fraudsters had certainly not been holding the Investors' money in escrow. (*Id*. at 22).

Instead, according to the Investors, the fraudsters "transferred [the money] from the Regions

Bank account and pillaged [it] for [their] personal pleasure…without any verification from

Regions in accordance with commonly accepted standards utilized in the banking industry to

verify that the transfers were made for valid EB-5 purposes." (*Id*. at 22).

The Investors claim in their amended complaint that Regions should bear liability for

their losses. In particular, the Investors allege that Regions violated both the EB-5 regulations

discussed above and regulations under the Bank Secrecy Act, colloquially known as "know your

customer" regulations. The "know your customer" banking regulations require banks to monitor

accounts for "suspicious activity" and to report such activity to Federal law enforcement.

12 C.F.R. § 21.11. The Investors argue that under these regulations, Regions should have

ensured that the 160 Royal Palm account holders did not misappropriate the EB-5 funds

contained in that account or use them for anything other than job creation, as such use would

result in the denial of the Investors' visa applications. (Doc. 9 at 24–26). The Investors also

argue that Regions failed to comply with "commonly accepted industry practices for the

handling of EB-5 accounts." (Doc. 9 at 26).

Although the Investors argue that Regions had a duty to monitor the EB-5 funds in the

160 Royal Palm account "separate and apart from" any duty to report suspicious activity under

the "know your customer" regulations, the Investors cite no authority beyond the EB-5

regulations themselves for this proposition. (Doc. 9 at 26). Instead, the Investors base this argument almost entirely upon references to banking industry custom as to the handling of EB-5 funds. Although the court discusses these arguments below, the court notes here that the *only* monitoring requirements the "know your customer" regulations place on banks are for the purposes of filing "suspicious activity reports" with Federal law enforcement. *See* 8 C.F.R. § 21.1 *et seq.*; 8 C.F.R. § 21.11.

The Investors brought five causes of action based on these allegations: failure to supervise and investigate (Count One); breach of fiduciary duty and vicarious liability through a theory of respondeat superior (Count Two); breach of contract (Count Three); various common-law claims (Count Four); and equitable accounting (Count Five). (*Id.* at 27–31). Regions moved to dismiss the complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P. (Doc. 12). The Investors filed a response brief (doc. 16), to which Regions filed a reply (doc. 17).

**Motion to Dismiss Standard**

When reviewing a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept as true all factual allegations in the plaintiff's complaint. *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). However, the court disregards "conclusory allegations" and "'naked assertions' devoid of 'further factual enhancement.'" *Finley*, 907 F.3d at 1333; *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). In other words, the court does not honor "unadorned, the-defendant-unlawfully-harmed-me accusations" with the presumption of truth. *McCullough*, 907 F.3d at 1324 (quoting *Iqbal*, 556 U.S. at 678). Such impermissible assertions include mere "'labels and conclusions' and 'formulaic recitations of a cause of action.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

After disregarding all assertions not entitled to a presumption of truth, the court examines the remaining factual allegations to ensure that they "*plausibly* give rise to an entitlement to relief." *McCullough*, 907 F.3d at 1324 (quoting *Iqbal*, 556 U.S. at 679) (emphasis added). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In short, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Motions to dismiss operate to root out claims with no legal basis. *White v. Bank of Am. Nat. Ass'n*, 559 F. App'x 379, 381 (11th Cir. 2015) (quoting *Cty. of McHenry v. Ins. Co. of the W.*, 438 F.3d 813, 818 (7th Cir. 2006)).

Finally, when either party asks the court to examine evidence outside the complaint in the context of a Rule 12(b)(6) motion, the court generally "must convert the motion [to dismiss] into a summary judgment motion." *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010). However, "the court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *Id*. (citing *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005)). The court may examine extrinsic evidence attached by either the plaintiff to its complaint or by the defendant to its motion to dismiss if the evidence meets this standard. *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999).

**Analysis**

Regions challenges the Investors' claims on a variety of grounds. As to the contract-based claims, Regions alleges that it did not have a contract with the Investors and that it did not enter in to any other contract for their direct benefit. To support this argument, Regions has

produced documents relating to the 160 Royal Palm account, including the documents created by Regions when 160 Royal Palm president Leslie Evans opened the account.

The court considers these documents in the context of Regions' motion to dismiss because the Investors do not dispute their authenticity. Further, the account documents are central to the Investors' claim that Regions breached a contract vis-à-vis the account by "disburs[ing] the Plaintiffs' monies for purposes not related to or permitted by the EB-5 program." (Doc. 9 at 30). *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) (citing *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005)).

As to the tort-based and breach of fiduciary duty claims, Regions alleges that it owed neither a fiduciary duty nor any duty in tort to the Investors, because they were not its customers and it did not hold their money in an escrow account. As to the Investors' remaining claims, Regions maintains that those claims constitute mere conclusory allegations that the court should disregard. Finally, Regions argues that the Investors' tort-based claims are time-barred. But because the court will grant Regions' motion as to the Investors' tort-based claims on other grounds, the court need not address this question.

The court will consider Regions' challenges in turn.

### a. Contract-based claims

The Investors claim that Regions and the Palm House Enterprise entered into a contract for their direct benefit and that Regions breached that contract by allowing the fraudsters to misuse their EB-5 funds. (Count Three, doc. 9 at 30–31). The Investors also claim that Regions owed them a duty of good faith and fair dealing (Count Four, "common-law claims," doc. 9 at 31). The court concludes that these claims lack any legal or factual basis.

At the outset, the court notes that the Investors might have abandoned their contract-based claims, because they did not address them in their response to Regions' motion to dismiss. However, because courts in this circuit have reached varying conclusions on the issue, the court will examine the merits of the Investors' contract-based claims out of an abundance of caution. *Compare Hooper v. City of Montgomery*, 482 F. Supp. 2d 1330, 1334 (M.D. Ala. 2007) (concluding that plaintiff abandoned certain claims by not addressing them in his response to defendants' motion to dismiss) *with Boyd v. Peet*, 249 F. App'x 155, 157 (11th Cir. 2007) (contra).

Under Alabama law, which governs this diversity case, "[i]t is well settled that one that is not a party to, or in privity with, a contract cannot sue for its breach." *Airlines Reporting Corp. v. Higginbotham*, 643 So. 2d 952, 954 (Ala. 1994) (citing *Twine v. Liberty Nat'l Life Ins. Co.*, 311 So. 2d 299 (Ala. 1975)). However, *direct*—as opposed to *incidental*—third-party beneficiaries "may sue on the contract." *Id*. But "[t]he party claiming to be a third-party beneficiary of a contract must establish that the contracting parties intended, at the time the contract was created, *to bestow a direct benefit* upon the third party." *Id*. (citing *Weathers Auto Glass, Inc. v. Alfa Mut. Ins. Co.*, 619 So. 2d 1328 (Ala. 1993)) (emphasis added).

Here, the Investors and Regions did not contract with each other. The account documents produced by Regions show that "160 Royal Palm LLC" owned the account that the Investors claim held their EB-5 funds. But when 160 Royal Palm's president Leslie Evans signed the signature card, Regions and *160 Royal Palm*—not the Investors—entered into a binding contract. *See McCulley v. SouthTrust Bank of Baldwin Cty.*, 575 So. 2d 1106, 1107 (Ala. 1991) (citing *Parr v. Godwin*, 463 So. 2d 129 (Ala. 1984)). But the Investors also claim that they were third-party beneficiaries of the contract between Regions and 160 Royal Palm. (Doc. 9 at 30).

The court concludes that the Investors were not third-party beneficiaries of the Regions-160 Royal Palm contract, so their breach of contract claim must fail as a matter of law. First, the Investors do not even allege that Regions and 160 Royal Palm intended to bestow a direct benefit upon them at the time 160 Royal Palm opened its account at Regions; nor do they provide any factual support for such a claim. Instead, they merely declare: "Regions breached its contract when it disbursed the Plaintiffs' monies for purposes not related to or permitted by the EB-5 program despite having notice that the funds were indeed those of EB-5 investors that required heightened due diligence for transfers" (doc. 9 at 30); and "Plaintiffs, as third-party beneficiaries of this contract, were injured." (Doc. 9 at 31).

These allegations constitute nothing more than "'naked assertions' devoid of 'further factual enhancement.'" *See Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Even if Regions did have notice that the 160 Royal Palm bank account housed EB-5 funds, the Investors do not allege that Regions knew that the account housed *their* EB-5 funds. Additionally, Regions' account documents show that 160 Royal Palm opened the account on November 15, 2013 (doc. 12-1 at 4), but a transfer receipt the Investors produced shows that the account did not contain EB-5 funds until at least November 26, 2013. (Doc. 9-3 at 2).

The Investors attached the bank transfer receipt to their amended complaint. This document indicates that a third party transferred funds labeled "EB5 Investment" into the 160 Royal Palm account at Regions. (Doc. 9–3 at 2.) The court will consider this evidence in the context of the motion to dismiss because Regions does not dispute its authenticity and because it is central to the Investors' claim that Regions allowed the 160 Royal Palm account owners to steal the EB-5 funds. *SFM Holdings*, 600 F.3d at 1337.

As such, at the time the parties entered into it, the contract between 160 Royal Palm and Regions did not even *incidentally* benefit the investors, because 160 Royal Palm merely opened a general business checking account with Regions, made no mention of the Investors, and did not inform Regions that the account would later house EB-5 funds. (Doc. 12-1 at 4–6). Because the Investors were "stranger[s] to the contract" between 160 Royal Palm and Regions, they "cannot complain of any alleged breach of that contract." *See Higginbotham*, 643 So. 2d at 954.

The Investors' claim that Regions breached its contractual duty of good faith and fair dealing fails for the same reason: Regions and the Investors did have a contract. *See Shoney's LLC v. MAC East, LLC*, 27 So. 3d 1216, 1220 n.5 (Ala. 2009) ("in every *contract* there exists an implied covenant of good faith and fair dealing") (quoting *Sellers v. Head*, 73 So. 2d 747, 751 (Ala. 1954)) (emphasis added). Because the Investors and Regions did not have a contract, Regions did not owe them a duty of good faith and fair dealing.

The court concludes that Investors' contract-based claims are not plausible and have no legal basis and, as such, will **GRANT** Regions' motion as to the breach of contract claim (Count Three) and as to the breach of the duty of good faith and fair dealing claim (Count Four, "common-law claims").

### b.  Tort-based claims

The Investors also bring several tort-based claims against Regions, including failure to supervise and investigate (Count One), and intentional harm, negligence, and wantonness (all alleged in Count Four, "common law claims"). (Doc. 9 at 27, 31).

To the extent the Investors claim Regions intentionally harmed them (Count Four, "common-law claims"), the Investors proffer absolutely no factual support for that claim. Because a claim with no factual support lacks a legal basis, the court will **GRANT** Regions'

motion as to the intent-based claim (Count Four, "common-law claims"), *Iqbal*, 556 U.S. at 678, and will examine the Investors' remaining negligence-based tort claims.

To state a claim for negligence in Alabama, a plaintiff must allege that the defendant (1) owed a duty to the plaintiff, (2) the defendant breached that duty, and (3) proximately and factually caused (4) injury to the plaintiff. *Hilyer v. Fortier*, 227 So. 3d 13, 22–23 (Ala. 2017) (quoting *Lemley v. Wilson*, 178 So. 3d 834, 841–42 (Ala. 2015)). Regions argues that the Investors' negligence-based claims fail at the first element because Regions owed no duty in tort to either supervise their employees or to investigate or monitor the 160 Royal Palm account for the benefit of the Investors. The court agrees.

Because the Investors did not own the account at Regions that held the EB-5 funds, the Investors were not Regions' customers. And in general, banks do not owe a duty in tort to non-customers. *Smith v. AmSouth Bank, Inc.*, 892 So. 2d 905, 909 n.2 (Ala. 2004) (collecting cases and pointing out that "[e]very court that has examined the issue has answered that banks owe no duty of care to noncustomers").

The Investors maintain, however, that the Alabama Supreme Court's decision in *Patrick v. Union State Bank*, 681 So. 2d 1364 (Ala. 1996) imposed upon Regions a duty owed to them in these circumstances. In *Patrick*, an unknown imposter stole Ms. Bridgette Patrick's temporary driver's license, which did not contain Ms. Patrick's photograph. The imposter then used Ms. Patrick's temporary license to open a checking account at Union State Bank in Ms. Patrick's name. The bank employee who opened the account for the imposter testified that the imposter did not provide a permanent address and that the imposter's signature did not match the signature on Ms. Patrick's temporary license; the employee, however, opened the account for the imposter anyway and issued her checks bearing Ms. Patrick's name. *Patrick*, 681 So. 2d at 1365.

11

After opening the account, the imposter deposited only $100 in the account but used the checks to make purchases from various merchants totaling approximately $1,500. *Patrick*, 681 So. 2d at 1365. The eleven jurisdictions in which the imposter wrote the bad checks then issued warrants for Ms. Patrick's arrest. Before the charges against her were dismissed, Ms. Patrick spent around ten days incarcerated because of the warrants. *Patrick*, 681 So. 2d at 1366.

Ms. Patrick then brought a negligence suit against Union State Bank, alleging that it breached a duty to her by opening the account in her name for the imposter. *Patrick*, 681 So. 2d at 1366. The bank argued that it did not owe a duty to Ms. Patrick because she was not its customer, but the court disagreed, holding instead that "a bank owes a duty of reasonable care to the person *in whose name*, and *upon whose identification*, an account is opened to ensure that the person opening the account and to whom checks are given is not an imposter." *Id*. at 1371 (emphasis added). In reaching this conclusion, the court reasoned that "the bank undeniably though that it had a relationship with Ms. Patrick when it opened the account for, and gave checks to, an imposter." *Id*. at 1369.

Regions, on the other hand, argues that the Alabama Supreme Court's decision in *Smith v. AmSouth Bank*, 892 So. 2d 905 (Ala. 2004) governs in this case. In *Smith*, a business partner of Mr. Smith, the plaintiff, opened a checking account in their shared business's trade name at AmSouth Bank. Mr. Smith's business partner then deposited checks made out to the business into the AmSouth account he controlled without Mr. Smith's knowledge. *Smith*, 892 So. 2d at 907.

The Alabama Supreme Court used Mr. Smith's negligence claim against AmSouth to clarify its holding in *Patrick*. The court explicitly rejected Mr. Smith's assertion that *Patrick* "imposes a duty of care upon banks making them liable to the public at large and…to

12

noncustomer[s]." *Smith*, 892 So. 2d at 909. Instead, the court pointed out that its decision in *Patrick* rested on the proposition that, given a "special relationship" or "special circumstances," a person—including a bank—may owe a "duty to protect another from the criminal acts of a third person." *Id.*

The court then noted that—unlike Ms. Patrick and Union State Bank—Mr. Smith and AmSouth had no relationship at all. Unlike *Patrick*, where Union State Bank at least "*thought* that it had a relationship with Ms. Patrick," AmSouth "knew full well with whom it was dealing," so the court found "no evidence indicating that AmSouth had, or should have had, knowledge of any of [the business partner's] wrongful dealings." *Smith*, 892 So. 2d at 909–10 (emphasis in original).

Finally, the court pointed out that if "special circumstances" exist between a bank and a non-customer, the bank may owe a duty of care to the non-customer to protect it from the criminal acts of a third person. The key inquiry in the "special circumstances" analysis, the court noted, "is whether the defendant 'knew or had reason to know of a probability of conduct by third persons that would endanger the plaintiff.'" *Smith*, 892 So. 2d at 910 (quoting *Patrick*, 681 So. 2d at 1372). In the banking context, the court pointed out that "special circumstances" may exist if "it was foreseeable [to the bank] that the *opening of the checking account under the particular circumstances* would lead to criminal activity." *Id.* at 911 (emphasis added). The court concluded that the business partner's mere opening of a business checking account using a trade name did not make his future fraud foreseeable, unlike the actions of the imposter in *Patrick*, who opened the personal checking account under highly suspicious circumstances. *Id.*

In this case, the court concludes that, like AmSouth in *Smith*, Regions had no "special relationship" with the Investors because it "knew full well with whom it was dealing:" 160 Royal

Palm. *See Smith*, 892 So. 2d at 910. The Investors make no allegation that 160 Royal Palm misrepresented itself to Regions when it opened the account. The Investors also make no plausible allegation—beyond threadbare conclusory statements—that Regions knew or should have known of the account holders' fraud. The Investors' claims are, therefore, readily distinguishable from Ms. Patrick's claim. *Cf. Patrick*, 681 So. 2d at 1371.

To be sure, the Investors present some evidence that Regions knew that the 160 Royal Palm checking account held EB-5 funds and that federal regulations govern the use of such funds. As stated above, the Investors attached a bank transfer receipt to their amended complaint indicating that a third party transferred funds labeled "EB5 Investment." (Doc. 9–3 at 2.)

But such knowledge, without more, does not support the Investors' bare assertion that Regions knew or should have known of the *fraud* that the account owners commited against them. The plain text of the EB-5 regulations shows that the regulations do not in any way purport to require *banks* that operate EB-5 accounts to monitor those accounts for wrongdoing or to ensure that the holders of those accounts do not misuse the funds. Instead, the regulations place the burden on the *immigrant investor* to show that the money funded a "new commercial enterprise." *See* 8 C.F.R. § 204.6.

Similarly, the court further concludes that Regions could not have foreseen the account holders' fraud at the time they opened the 160 Royal Palm account. So Alabama law did not impose a duty upon Regions to prevent the fraud because no "special circumstances" existed between it and the Investors. The account holders in this case merely opened a general business checking account on November 15, 2013. (Doc. 12-1 at 4). It did not hold the Investors' EB-5 funds until November 26, 2013. (Doc. 9-3 at 2). So Regions did not know that the 160 Royal Palm account would hold EB-5 funds at the time it opened the account.

14

The Investors again allege that the mere fact that the 160 Royal Palm account held EB-5 funds made the fraud foreseeable, because federal regulations require immigrant investors to use such funds only to create jobs for a "new commercial enterprise." (Doc. 16 at 15–16); *see* 8 C.F.R. §§ 204.6(i); 216(a). But as stated above, these regulations do not require *banks* to ensure that the holder of an EB-5-funded account does not misappropriate the funds. 8 C.F.R. § 204.6. Even assuming that Regions knew that the account held EB-5 funds and that EB-5 funds have an extremely limited permissible use, the Investors do *not* allege that Regions knew or should have known the account would hold EB-5 funds *at the time of its opening*. The 160 Royal Palm account did not contain EB-5 funds until eleven days after the account holders opened it. And *Smith* establishes that courts must "focus" their "special circumstances" inquiry on the circumstances as they existed when the account holder opened the account. *Smith*, 892 So. 2d at 911.

Together, the *Patrick* and *Smith* decisions lead the court to the inescapable conclusion that Regions did not owe the Investors a duty to prevent the fraud. The Investors were not Regions' customers, and the holding in *Patrick* did not create a duty running from banks to the general public. And the Investors did not have a "special relationship" with Regions; nor did the opening of the account present such "special circumstances" as to impose a duty on Regions under *Smith*. The court also points out that another court presented with similar facts has reached the same conclusion. The Virginia Supreme Court in *Collins v. First Union National Bank* concluded that the bank holding EB-5 funds in "for the benefit of" accounts for EB-5 investors owed those investors no duty to prevent fraud, because the investors were not the bank's customers. 636 S.E.2d 442, 446 (Va. 2006)

15

The Investors, however, attempt to escape these well-settled points of law by fervently arguing throughout both their amended complaint and response brief that banking industry custom regarding EB-5 funds mandated that Regions monitor the 160 Royal Palm account for their benefit. (Doc. 9 at 24–27; doc. 16 at 15–16).

This argument, however, misunderstands the nature of the relationship between industry custom and tort law. To the extent industry custom has relevance to tort law, such relevance goes to the question of *breach of duty*, not to the question of *the existence of a duty*. *E.g.*, Restatement (Second) of Torts § 449 ("[B]ased on the evidence of the banking industry's custom…[the bank's actions] *fell below the standard of care* owed to [the plaintiff]") (quoting *Bullis v. Sec. Pac. Nat. Bank*, 582 P.2d 109, 115 (Cal. 1973)) (emphasis added).

In the same vein, the Investors further argue that the federal "know your customer" banking requirements, the EB-5 statute, and the EB-5 regulations *themselves* imposed a duty on Regions to ensure that the 160 Royal Palm account holders did not misuse the funds. (Doc. 9 at 24–25). This argument, the court notes, sounds in strict liability, but otherwise fails for several reasons.

First, like the Virginia Supreme Court in *Collins*, another court that addressed the applicability of the EB-5 regulations in the context of state tort law concluded that the regulations did *not* impose a duty upon the financial institution operating an EB-5 account for the benefit of the EB-5 investors. *Sutton v. Vt. Reg'l Ctr.*, ---A.3d----, 2020 WL 4380709, at *7–8 (Vt. July 31, 2020). The Vermont Supreme Court in *Sutton* concluded that the EB-5 regulations did not impose a common-law duty of care for the benefit of EB-5 investors upon a "regional

center"[2] that operated an EB-5 account to ensure that the account holder properly used the funds, reasoning that the financial protection of investors was not "the target of these regulations."

Also, the Alabama Supreme Court has held that federal statutes and regulations—like industry custom—may set the standard of care, but do not independently create common-law duties that do not otherwise exist. *Compare Rodopoulos v. Sam Piki Enters.*, 570 So. 2d 661, 665 (Ala. 1990) (allowing FTC regulations to establish the *specifics* of duty to disclose when defendant already owed plaintiff a duty to disclose at common law) *with Indus. Tile, Inc. v. Stewart*, 388 So. 2d 171, 174 (Ala. 1980) (allowing OSHA regulations to set the standard of care when, like in *Rodopoulos*, the defendant already owed plaintiff a duty at common law to maintain a safe jobsite).

And additionally, as Regions correctly points out, the statute creating the EB-5 program does not create a private right of action. *See* 8 USC § 1153(b)(5). The United States Supreme Court has stated that a regulation cannot create a private right of action if the statute under which the regulation was promulgated does not itself create such a right. *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("it is most certainly incorrect to say that language in regulation can conjure up a private cause of action that has not been authorized by Congress"). Without a private right of action or an independent common-law duty, the EB-5 regulations did not require Regions to monitor the 160 Royal Palm account for the benefit of third parties, such as the Investors.

---

[2] Under the EB-5 regulations, "regional centers" are entities that "promote economic growth" through, among other things, holding, managing, and investing EB-5 funds. 8 C.F.R. § 204.6(m)(3)(i). The regulations require regional centers to report to USCIS the steps they take to invest and manage EB-5 funds. 8 C.F.R. § 204.6(m)(6)(i). The Investors do not allege that the regulations required Regions to file such reports. And as shown above, even if Regions did have such a duty under the Regulations, such duty did not run to the Investors.

Likewise, the Investors' argument that the Federal "know your customer" regulations required Regions to monitor the 160 Royal Palm account for their benefit also fails. The federal courts that have addressed the question have overwhelmingly held that the "know your customer" regulations under the Bank Secrecy Act do not impose a duty upon banks to monitor accounts for the benefit of noncustomers. *See, e.g.*, *Belle Meade Title & Escrow Corp. v. Fifth Third Bank*, 282 F. Supp. 3d 1033, 1039–40 (M.D. Tenn. 2017) (collecting a voluminous number of federal cases and stating, "'[t]he obligation under [the regulations] is to the government rather than some remote victim. The bank's obligation is not to roam through its customers looking for crooks…[the regulations do not] create a private right of action and, therefore, [do not] establish a standard of care'") (quoting *Marlin v. Moody Nat'l Bank, N.A.*, No. H-04-4443, 2006 WL 2382325, at *7 (S.D. Tex. Aug. 16, 2006)).

Because Regions clearly did not owe a duty in tort to the Investors under Alabama law, the Investors return to the EB-5 regulations and argue that they impliedly preempt Alabama tort law to the extent such law refuses to impose a duty on banks to monitor general business checking accounts for the benefit of noncustomers. (Doc. 16 at 11–14). The court disagrees.

First, the court notes that the Investors point to no case that stands for the proposition they advance: that EB-5 regulations preempt state tort law and independently impose a duty upon banks to monitor EB-5 funds for the benefit of persons that are not the bank's customers. And to the extent the Investors' brief does not support this argument, neither does the law of implied preemption.

Federal law impliedly preempts state law in two situations: first, "when a congressional legislative scheme 'is so pervasive as to make the reasonable inference that Congress left no room for the states to supplement it,'" ("field preemption") and second, where "it is physically

impossible to comply with both the federal and the state laws or when the state law stands as an obstacle to the objective of federal law," ("conflict preemption"). *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1167 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

The Investors argue that field preemption applies here, asserting that the federal immigration scheme "is so pervasive" as to prohibit state law supplementation in the immigration field. (Doc. 16 at 12); *Browning*, 522 F.3d at 1167. The court, however, concludes that it does not. For one thing, if Congress has in fact occupied the field of immigration law so pervasively such to eliminate any room for state law to supplement it, Alabama state tort law does not "supplement" the EB-5 regulations. In fact, as the court explained above, the opposite is true: the *EB-5 regulations* might supplement *Alabama state tort law* to the extent those regulations set the standard of care for the management of EB-5 funds, *if the bank owes a common-law duty to the owner of such funds*.

Regions, however, did not owe any duty to the Investors under Alabama law, so the EB-5 regulations have no relevance to their relationship with Regions. And by its terms, the Alabama common-law rule that banks owe no duty to noncustomers does not in any way "supplement" either federal immigration law or the federal "know your customer" banking regulations, neither of which create a duty of care running from banks to noncustomers, as discussed above. The Investors, therefore, find no solace in the implied preemption doctrine.

Finally, as a last-gasp attempt to find a duty that Regions owed to them, the Investors point out an Eleventh Circuit case that imposed a tort duty on a bank for the benefit of noncustomers. *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087 (11th Cir. 2017). In *Chang*, the court—applying Florida law, which does not apply in this case—stated that "a bank

may be liable to a noncustomer for its customer's misappropriation when a fiduciary relationship exists between the customer and the noncustomer, the bank knows or ought to know of the fiduciary relationship, and the bank has *actual knowledge of its customer's misappropriation*." *Id*. at 1094–95 (emphasis added).

Even if 160 Royal Palm and the Investors had a fiduciary relationship, the Investors make no factually-supported allegation that Regions knew of this relationship; nor do they allege that Regions had actual knowledge of 160 Royal Palm's misappropriation of the Investors' funds. Instead, the Investors merely allege that Regions *should have known* that 160 Royal Palm was misappropriating their funds, because Regions knew the account held EB-5 funds. (Doc. 9 at 26–27). But the court's reasoning in *Chang* shows that the bank must have had *actual knowledge* of the account holder's misappropriation if the noncustomer seeks to hold the bank liable in tort for that misappropriation. *Chang*, 845 F.3d at 1094–95. In *Chang*, for example, the bank's vice president assisted in the fraud on the noncustomer. *Id*. at 1091. The Investors make no such allegation here. The Investors' case thus bears no relationship to the facts in *Chang*.

In sum, the Investors have searched every nook and cranny of the law to find a duty Regions owed them, but their search produced none. Because Regions owed no duty to the Investors to prevent the Palm House Enterprise's fraud, any allegation that Regions breached such a duty lacks plausibility and has no legal basis. The court will therefore **GRANT** Regions' motion as to Count One, "failure to supervise and investigate;" and as to the tort-based claims alleged in Count Four, negligence and wantonness (doc. 9 at 31).

### c.   Breach of fiduciary duty and vicarious liability

In Count Two, the Investors allege that Regions breached a fiduciary duty it owed to them and maintain that the court should hold Regions vicariously liable for the acts of its

employees. (Doc. 9 at 28–30). Regions argues that it did not owe a fiduciary duty to the Investors and that, because the Investors have failed to state a plausible claim that Regions' employees committed any wrongful acts, no basis exists upon which to impose vicarious liability on Regions.

Again, the court agrees with Regions.

Under Alabama law, banks generally do not owe fiduciary duties to their customers unless the customer "reposes trust in the bank and relies on the bank for financial advice, or in other special circumstances." *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1190–91 (Ala. 2008) (quoting *K & C Dev. Corp. v. AmSouth Bank*, 597 So. 2d 671, 675 (Ala. 1992)). Instead, "courts have traditionally viewed the relationship between a bank and its customer as a creditor-debtor relationship that does not impose a fiduciary duty on the bank." *Id.*

Here, Regions did not even owe a fiduciary duty to *160 Royal Palm*—the account holder—let alone to the Investors, who were not even customers of Regions. The Investors instead allege that the Regions account that housed their EB-5 funds "was, in essence, serving as an 'escrow' account" for their funds and that Regions owed the Investors a fiduciary duty by virtue of the "escrow-like" nature of the account. (Doc. 9 at 25, 28–29).

The Investors are correct that a bank that maintains an escrow account owes a fiduciary duty to both parties to the escrow agreement. *Gurley v. Bank of Huntsville*, 349 So. 2d 43, 45 (Ala. 1977). But 160 Royal Palm did not open an escrow account, as it promised the Investors it would. Instead, as shown by Regions, 160 Royal Palm opened only a run-of-the-mill business checking account. (Doc. 12-1 at 4). And the Investors do not allege that 160 Royal Palm informed or otherwise made known to Regions that it would operate the account as an escrow account at the time it opened the account. Instead, as Regions points out, the Palm House

Enterprise falsely represented to the *Investors* that it would hold their money in escrow. Because the Investors do not allege that Regions had anything to do with—or had any knowledge of—this misrepresentation, the Investors' breach of fiduciary duty claim fails as a matter of law, as they have not plausibly alleged that Regions owed them a fiduciary duty.

The Investors' vicarious liability claims likewise fail as a matter of law. As explained above, neither Regions nor its employees owed any duty to the Investors, either tort-based or fiduciary, to prevent fraud. And under Alabama law, "[t]he doctrine of vicarious liability is premised on the fact that an agent or employee has committed his or her own misfeasance or malfeasance…*i.e.*, the agent or employee *has violated a duty created and imposed by law*…." *Indus. Dev. Bd. of City of Montgomery v. Russell*, 124 So. 3d 127, 138 (Ala. 2013) (emphasis added). The court therefore concludes that the Investors have not plausibly alleged a claim of vicarious liability against Regions.

Because the Investors have not plausibly alleged either their breach of fiduciary duty claim or their vicarious liability claim, the court will **GRANT** Regions' motion to dismiss as to Count Two.

### d.   Remaining claims

Finally, the Investors bring claims against Regions for fraud and unjust enrichment (Count Four, "common-law claims") and for an equitable accounting (Count Five). These claims likewise fail.

First, as to the Investors' unjust enrichment claim, the Investors do not allege that any benefit inured to *Regions* through the Palm House Enterprise scheme. Alabama law requires such an allegation to support an unjust enrichment claim. *See Matador Holdings., Inc. v. HoPo Realty Invs., LLC*, 77 So. 3d 139, 145 (Ala. 2011) (requiring a plaintiff to show that "the defendant

knowingly accepted and retained a benefit" to state a claim for unjust enrichment). The Investors' unjust enrichment claim, therefore, fails as a matter of law.

The Investors' fraud claim is likewise devoid of any factual support. At most, the Investors have shown that Regions held their funds in a garden-variety business checking account, and that a third party subsequently misappropriated those funds. They have not alleged, for example, that Regions made any false representation to them, which is an element of a fraud claim in Alabama. *See Deng v. Scroggins*, 169 So. 3d 1015, 1024 (Ala. 2014).

And the Investors are not entitled to an equitable accounting because they have not shown an entitlement to any other relief. An equitable accounting is "incidental to other relief." *Hiring Automation, LCC v. Simple Onboard, LLC*, 363 F. Supp. 3d 1337, 1343 (N.D. Ala. 2019).

Because the Investors have not stated a plausible claim for unjust enrichment, fraud, or for an equitable accounting, the court will **GRANT** Regions' motion as to the Investors' remaining claims in Count Four, "common-law claims," and as to Count Five.

**e. Investors' request for leave to amend their complaint**

The Investors, in the alternative, seek leave to file a second amended complaint. (Doc. 16 at 20). But the court concludes such an amendment would be futile, as Regions moved to dismiss the Investors' original complaint on virtually identical grounds (doc. 7), after which the Investors filed an amended complaint.

Accordingly, the court will **DENY** the Investors' request for leave to amend (doc. 16 at 20) because, as shown above, any amendment to their complaint would be futile, because the Investors cannot plausibly allege any of their causes of action. *See Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1094 (11th Cir. 2017).

**Conclusion**

In dismissing the Investors' amended complaint in its entirety, the court does not doubt that *someone* wronged them. But the Investors have simply not plausibly shown that Regions should bear any of their losses.

For the reasons discussed above, the court will **GRANT** Regions' motion to dismiss (doc. 17) in its entirety, will **DENY** the Investors' request for leave to amend (doc. 16), and will **DISMISS WITH PREJUDICE** the Investors' amended complaint (doc. 9).

The court will enter an Order dismissing the Investors' amended complaint contemporaneously with this opinion.

**DONE** and **ORDERED** this 18th day of September, 2020.

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE